No. 60,643

STATE OF KANSAS, *ex rel.* ROBERT T. STEPHAN, Attorney General, *Petitioner,* v. THE HONORABLE JAMES J. SMITH and THE HONORABLE PHILLIP M. FROMME, *Respondents.*

(747 P.2d 816)

Opinion filed December 15, 1987.

Robert T. Stephan, attorney general, argued the cause, and John W. Campbell, deputy attorney general, and Wm. Scott Hesse, assistant attorney general, were with him for the petitioner.

Max W. Foust, of Morris and Foust, of Kansas City, Missouri, argued the cause, and Stephen J. Smith, of Helbert, Bell & Smith, of Burlington, and Steven D. Steinhilber, of Morris and Foust, of Kansas City, Missouri, were with him for the respondents. James J. Smith, district judge, Fourth Judicial District, appeared in person.

Orville J. Cole, of Cole & Doering, of Garnett, argued the cause pro se.

Joseph G. Herold, of Osage City, for amicus curiae Joseph G. Herold.

Jerry G. Elliott, of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for amicus curiae Kansas Bar Association.

Clyde W. Toland, of Toland & Thompson, of Iola, and R. Kent Pringle, of Coombs, Pringle & Horn, of Chanute, for amicus curiae Southeast Kansas Bar Association.

Edward G. Collister, Jr., of Lawrence, for amicus curiae Douglas County Bar Association.

The opinion of the court was delivered by

MILLER, J.: This is an original action in mandamus, brought by the attorney general against two judges, the Honorable James J. Smith, of Garnett, a district judge of the Fourth Judicial

District, and the Honorable Phillip M. Fromme, of Burlington, a district magistrate judge of the Fourth Judicial District. At issue is an order entered by Judge Smith on March 5, 1987, establishing Anderson County rules and panels for indigent defense services, and a similar order entered by Judge Fromme for Coffey County on March 9, 1987. Judge Smith has responded, and Judge Fromme has adopted that response. The matter was argued orally before the court and is now ready for resolution.

The background facts are not in dispute. Orville J. Cole, an experienced trial attorney who offices at Garnett, in Anderson County, was appointed to represent three indigent defendants in criminal cases—A. DeWayne Buckridge in Coffey County, and Ricky Dale Revelle and Kyle W. Wallace in Anderson County. Cole filed motions in each of the cases, asking the district court to discharge him as appointed attorney for each defendant. Buckridge was charged with eleven felony counts; Mr. Cole, at the time of filing the motion, had made five trips from Garnett to Burlington, a round trip of 60 miles, and had spent a total of 40 hours on the case, which at that time was only through the preliminary hearing stage. Mr. Cole alleged in his motion that the amounts allowed for compensation from the State Board of Indigents' Defense Services are inadequate to pay even his· office overhead costs while his time was being spent on the indigent defense. He alleged that the defendant could not receive effective assistance of counsel unless counsel is adequately compensated and can thus afford to spend the time to properly represent his client. Also, in the case of *State v. Bonweg*, pending in the District Court of Osage County, Joseph G. Herold, an attorney whose office is in Osage City, in Osage County, had been cited for contempt by the district magistrate judge for refusing to accept an appointment to represent an indigent defendant, David Bonweg. Mr. Herold's appeal of that contempt citation, and Mr. Cole's motions to be discharged as attorney for indigent defendants in the three criminal cases were consolidated for hearing before Judge Smith. An evidentiary hearing was held in the consolidated matters on February 23, 1987, and the matter was continued until March 3, 1987, at which time the trial court set aside the contempt conviction of Joseph G. Herold, apparently finding that Mr. Herold was incompetent

in criminal law matters, and discharged Mr. Cole from his appointments as counsel for defendant Buckridge in the district court of Coffey County and for the defendant Wallace in the district court of Anderson County. The court continued the appointment of Mr. Cole as attorney for defendant Revelle in the district court of Anderson County, but set his compensation at $68 per hour for representing the indigent defendant in that proceeding. The court also ordered that the charges against Buckridge and Wallace be dismissed without prejudice, and the defendants discharged from custody within 30 days, unless during that time effective counsel agreed to represent said defendants for the rate allowed by the State Board of Indigents' Defense Services or the State provided "reasonable compensation."

That order and the proceedings in the four criminal cases are not the subject of this mandamus action, but are related here simply to show the background of the general orders next discussed, which form the basis of this proceeding.

On March 5, 1987, Judge Smith entered and filed an order in the office of the clerk of the district court of Anderson County, establishing Anderson County rules and panels for indigent defense services. We will refer to it as the "general order." The general order recited, *inter alia*, that attorneys cannot be required to serve as counsel for indigent persons unless a reasonable compensation is provided. "Reasonable compensation" is defined in the general order to mean compensation in the amount of $68 or more per hour, allowed by the executive branch for such amount of hours as is required for effective representation of the indigent defendant. The order further states:

"If reasonable compensation is not available for an attorney and does not become so available within 30 days after a defendant is determined to be indigent and effective assistance of counsel is not available to such indigent defendant at the end of such period, the charges against such defendant shall be dismissed without prejudice."

The order then proceeds to list six attorneys who are included on all panels, and one attorney who is included only on the care and treatment panel and the misdemeanor panel, for Anderson County.

On the following day, March 6, 1987, Judge Fromme entered a general order establishing Coffey County rules and panels for

indigent defense services in that county. It contained findings and orders identical to those of Judge Smith in the Anderson County order, and it listed five attorneys who are included on all panels.

On March 25, 1987, the State, on relation of the attorney general, filed a petition for mandamus. The petition sets forth the factual background and the entry of the general orders referred to above. It then recites that compensation for court appointed counsel for indigent criminal defendants is set by statute, K.S.A. 1986 Supp. 22-4507(a), and by regulation, K.A.R. 105-5-1 *et seq.* The State asks this court to issue a writ of mandamus compelling Judges Smith and Fromme to perform their statutory duties as directed by the Indigent Defense Services Act, K.S.A. 1986 Supp. 22-4501 *et seq.*, and the rules and regulations promulgated by the State Board of Indigents' Defense Services as published at K.A.R. 105-1-1 *et seq.*, and the common law, and to make appointments of counsel to indigent defendants as directed by law, and to compel Judges Smith and Fromme to rescind their respective general orders, described above, insofar as they apply to conditions of appointment based on compensation and the rates of compensation which exceed those established by the State Board of Indigents' Defense Services.

Judge Smith filed a response. He contends that mandamus is inappropriate; necessary parties are not included; there is no clear right to relief; appointed attorneys are entitled to reasonable compensation, based upon various constitutional provisions; indigent defendants are being denied competent counsel; and this court should hear additional evidence. The transcripts of the district court hearings of February 23 and March 3, 1987, were attached as exhibits. Judge Fromme adopted Judge Smith's response. An additional response was filed by Orville J. Cole. Memoranda and briefs of the parties and of various *amici curiae* have been filed, and this court has heard oral argument. The matter is now ready for decision.

Before proceeding further, it will be helpful to review the statutes and regulations. Unless otherwise noted, all of the pertinent statutes are contained within the 1986 cumulative supplement to the Kansas Statues Annotated. The State Board of Indigents' Defense Services was created by K.S.A. 22-4519. Its

powers and duties, insofar as are here material, are described in K.S.A. 22-4522, which reads:

"The state board of indigents' defense services may:

"(a) Provide, supervise and coordinate, in the most efficient and economical manner possible, the constitutionally and statutorily required counsel and related services for each indigent person accused of a felony and for such other indigent persons as prescribed by statute;

"(b) establish, in each county or combination of counties designated by the board, a system of appointed counsel . . . for the delivery of legal services for indigent persons accused of felonies;

. . . .

"(d) adopt rules and regulations in accordance with K.S.A. 77-415 *et seq.*, and amendments thereto, which are necessary for the operation of the board and the performance of its duties and for the guidance of appointed counsel, contract counsel and public defenders, including but not limited to:

. . . .

"(2) standards and guidelines for compensation of appointed counsel and investigative, expert and other services within the limits of appropriations."

### Other pertinent statutes include the following: K.S.A. 22-4501:

"(a) The judge or judges of the district court of each county shall prepare, and file in the office of the clerk of the district court, a list of attorneys who are eligible for assignment to represent indigent persons accused of crimes, such list to be known as the panel for indigents' defense services.

"(b) Each member of the panel for indigents' defense services shall be available to represent indigent defendants upon the appointment of any judge of the district court of the judicial district in which such member maintains an office for the practice of law, or any adjacent judicial district. All such appointments shall be in accordance with the applicable system for providing legal defense services for indigent persons prescribed by the state board of indigents' defense services for the county or judicial district. *A judge of the district court may appoint an attorney who is a member of the panel for indigents' defense services of a county other than the county where the case is pending only after such judge of the district court has found that no member of the panel for indigents' defense services of the county where the case is pending is eligible or qualified to represent the defendant.*

. . . .

"(d) The state board of indigents' defense services shall provide by rule and regulation for the assignment of attorneys to the panel for indigents' defense services, for the distribution of the list of panel members to the judges of the district court and law enforcement officials of the judicial district, and for the appointment, by rotation or otherwise, of counsel from the panel for indigents' defense services to represent indigent persons charged with crimes in such cases and under such circumstances as may be required by law." (Emphasis supplied.)

### K.S.A. 22-4503:

"(a) A defendant charged by the state of Kansas in a complaint, information or indictment with any felony is entitled to have the assistance of counsel at every stage of the proceedings against such defendant and a defendant in an extradition proceeding, or a habeas corpus proceeding . . . , is entitled to have assistance of counsel at such proceeding. . . .

"(b) If such a defendant appears before any court without counsel to assist and conduct the defendant's defense, it shall be the duty of the court to inform the defendant that such defendant is entitled to counsel and that counsel will be appointed to represent the defendant if the defendant is not financially able to employ an attorney. . . .

"(c) If it is determined that the defendant is not able to employ counsel, as provided in K.S.A. 22-4504 and amendments thereto, *the court shall appoint an attorney from the panel for indigents' defense services or otherwise in accordance with the applicable system for providing legal defense services for indigent persons prescribed by the state board of indigents' defense services for the county or judicial district.*

"(d) . . . It is the duty of an attorney appointed by the court to represent a defendant, without charge to such defendant, to inform the defendant fully of the crime charged against the defendant and the penalty therefor, and in all respects fully and fairly to represent the defendant in the action." (Emphasis supplied.)

### K.S.A. 22-4507:

"(a) An attorney . . . who performs services for an indigent person, as provided by this act, shall at the conclusion of such service or any part thereof be entitled to compensation for such services and to be reimbursed for expenses reasonably incurred by such person in performing such services. *Compensation for services shall be paid in accordance with standards and guidelines contained in rules and regulations adopted by the state board of indigents' defense services under this section.*

"(b) Claims for compensation and reimbursement shall be certified by the claimant. In accordance with standards and guidelines adopted by the state board of indigents' defense services under this section, all such claims shall be reviewed and approved by one or more judges of the district court before whom the service was performed . . . . Each claim shall be supported by a written statement, specifying in detail the time expended, the services rendered, the expenses incurred in connection with the case and any other compensation or reimbursement received. When properly certified and reviewed and approved, each claim for compensation and reimbursement shall be filed in the office of the state board of indigents' defense services. If the claims meet the standards established by the board, the board shall authorize payment of the claim.

"(c) If the state board of indigents' defense services determines that the appropriations for indigents' defense services or the moneys allocated by the board for a county or judicial district will be insufficient in any fiscal year to pay in full claims filed and reasonably anticipated to be filed in such year under this

section, *the board may adopt a formula for prorating the payment of pending and anticipated claims under this section.*

"(d) The state board of indigents' defense services may make expenditures for payment of claims filed under this section from appropriations for the current fiscal year regardless of when the services were rendered.

"(e) The state board of indigents' defense services shall adopt rules and regulations prescribing standards and guidelines governing the filing, processing and payment of claims under this section." (Emphasis supplied.)

K.S.A. 22-4522 authorizes the Board to contract, in each county or combination of counties, for the services of counsel to represent indigent defendants, and to adopt and submit an annual budget. K.S.A. 22-4523 authorizes the Board to appoint public defenders and to provide for the establishment and staffing of public defender offices.

The published regulations of the State Board of Indigents' Defense Services, pertinent here, and included in the 1984 edition of the Kansas Administrative Regulations unless otherwise noted, are as follows:

Article 1.—GENERAL

"105-1-1. (a) Legal representation, at state expense, shall be provided to all persons who are financially unable to obtain adequate representation without substantial hardship to themselves or their families in the following cases:

" (1) felony cases at the trial court level;

" (2) habeas corpus cases arising out of an extradition proceeding pursuant to K.S.A. 22-2710;

" (3) habeas corpus cases arising from a mental commitment pursuant to K.S.A. 1982 Supp. 22-3428;

" (4) probation revocation hearings;

" (5) habeas corpus cases as authorized by K.S.A. 1982 Supp. 22-4506;

" (6) motions attacking sentence pursuant to K.S.A. 60-1507;

" (7) motions to modify sentence pursuant to K.S.A. 21-4603;

" (8) appeals from felony convictions or habeas corpus findings to the appellate courts of Kansas;

" (9) appeals from an order of the court waiving jurisdiction of a juvenile offender to the criminal courts;

"(10) habeas corpus cases arising out of an involuntary commitment pursuant to K.S.A. 1982 Supp. 59-2917;

"(11) grand jury witnesses called to testify pursuant to K.S.A. 22-3009;

"(12) material witnesses committed to custody as authorized by K.S.A. 1982 Supp. 22-2805; and

"(13) any other cases in which legal representation at state expense is required by law.

. . . .

"(c) Legal representation shall continue until final resolution of the cause for which appointed."

### Article 2.—TERMS DEFINED

"105-2-1 [1986 Supp.]. **Definitions.** Unless the context otherwise requires, terms used in K.A.R. 105-1-1 et seq., forms and instructions shall have the following meanings:

"(a) Board means the state board of indigents' defense services.

"(b) Director means the state director of indigents' defense services appointed by the board.

"(c) District means judicial district.

"(d) Legal representation means representation of indigent defendants by a qualified and effective attorney, as well as transcript preparation and other related defense services by investigators, expert witnesses and others when requested by the attorney and approved by the court.

"(e) Panel means the list of qualified attorneys in a county who are eligible for appointment to represent indigent defendants.

"(f) Public defender means an attorney selected and employed on full-time basis by the board to provide quality legal representation to indigent defendants pursuant to K.S.A. 1984 Supp. 22-4501, et seq.

. . . .

"(h) Trial counsel means an attorney or public defender appointed under the terms of these regulations to provide legal representation to indigent defendants in the district courts of Kansas and as provided by K.A.R. 105-3-9."

### Article 3.—APPOINTED ATTORNEYS

"105-3-2. **Eligibility to serve.** *All licensed attorneys engaged in private practice shall be included on the panel, with the following exceptions*: (a) full-time employees of any nonprofit corporation currently providing legal services to indigents; or

"(b) those attorneys who request to be excused due to age or retirement, if there exists an adequate number of other local attorneys to handle the caseload of indigent defendants.

"The above exceptions may be waived upon application to the administrative judge and with approval of the judge and the board. *Additional exceptions may be made by the administrative judge with the approval of the board.*" (Emphasis supplied.)

"105-3-3. **Rotation of appointments.** All appointments shall be made in an orderly manner to avoid patronage, or the appearance of patronage, and to ensure fair distribution of appointments among all whose names appear on the panel. Names on the panel shall be in alphabetical order and appointments shall be made in sequence with the following exceptions: (a) When the court determines there is a conflict of interest, the next listed attorney shall be appointed.

"(b) When the court determines the attorney lacks sufficient experience in a serious felony case, the next qualified attorney shall be appointed.

"(c) When the court determines an emergency appointment of counsel is required, the first available attorney may be appointed; or

"(d) When the court determines the attorney is unavailable to promptly handle the case, the next listed attorney shall be appointed.

"Any attorney who is passed over shall be first in sequence for the next appointment."

"105-3-4: Responsibility for appointments. Panel attorneys shall have primary responsibility for those cases to which they have been appointed."

"105-3-6. Distribution of panels. The administrative judge of each district shall distribute the list of panel members to judges of the district court, law enforcement officials within the district and the board. The list of panel members shall be distributed annually and as it is revised."

"105-3-10 [1986 Supp.]. Appointments generally. Each court appointment funded by the board shall be made in accordance with the rules and regulations adopted by the board for providing legal defense services for indigent persons as prescribed by the board."

Article 4.—ENTITLEMENT TO LEGAL REPRESENTATION

"105-4-1. Determination of eligibility. (a) At the commencement of proceedings against any defendant, the defendant may make application for legal representation at state expense by submitting, to the court, an affidavit of indigency on forms provided by the board. The court shall determine if the defendant is indigent, based upon consideration of the following factors . . . .

. . . .

"105-4-4. Finding of indigency. If the court finds a defendant who is entitled to counsel to be indigent, as defined by statute and these regulations, *the court shall appoint counsel to provide legal representation. A court order authorizing legal representation at state expense shall be made on a form approved by the board.*" (Emphasis supplied.)

Article 5.—ATTORNEY COMPENSATION

"105-5-1. General provisions. Subject to availability of funding, and with the approval of the appropriate judge as provided in K.S.A. 1982 Supp. 22-4507(b), *attorneys appointed to represent indigent defendants pursuant to K.S.A. 22-4501, et seq., shall be compensated for time spent in case preparation and presentation in court, at the rate set forth in K.A.R. 105-5-2.*

"Compensation shall be subject to maximum compensation limitations as set forth in K.A.R. 105-5-6 and K.A.R. 105-5-7." (Emphasis supplied.)

"105-5-2. Rates of compensation. Appointed counsel shall be compensated at the rate of $30 per hour for time spent in preparing cases for trial or appeal and for in-court presentation."

"105-5-6 [1986 Supp.]. Maximum compensation; non-tried cases. (a) Each appointed attorney shall be compensated for time expended in representing indigent defendants and other indigent persons at the hourly rate prescribed in K.A.R. 10-5-2. Except as provided in K.A.R. 105-5-8, compensation shall not exceed $400 in the following cases: . . .

. . . .

"(b) Except as provided in K.A.R. 105-5-8 and K.A.R. 105-5-6(a), compensation to appointed attorneys shall not exceed $250 in the following types of cases: . . .

. . . .

"(c) Except as provided in K.A.R. 105-5-8, compensation shall not exceed $100 in the following types of cases. . . ."

"**105-5-7. Maximum compensation; trials.** Appointed attorneys shall be compensated for time expended in representing indigent defendants at the hourly rate prescribed in K.A.R. 105-5-2. Except as provided in K.A.R. 105-5-8, compensation for felony cases tried on pleas of not guilty and submitted to a judge or jury for adjudication, including compensation for services at the preliminary hearing, sentencing and motions to modify sentence, shall not exceed $1,000. This regulation will take effect on and after July 1, 1984."

"**105-5-8. Compensation; exceptional cases.** (a) Compensation for attorneys' services in excess of the maximum amounts set out in K.A.R. 105-5-6 and K.A.R. 105-5-7 shall be approved only in exceptional cases. An exceptional case is:

"(1)(A) Any case involving a Class A or Class B felony charge; or

"(B) any case tried on a not guilty plea in which there have been 25 or more hours spent in court in defense of the indigent defendant; or

"(C) any case not submitted to a judge or jury in which there have been ten hours or more of in-court time spent in defense of the indigent defendant; and

"(2) any such case which has been declared an exceptional case by the court due to its complexity or other significant characteristics. Such finding by the court is subject to final approval by the board.

"(b) All claims for compensation in exceptional cases shall be accompanied by a specific finding in a court order setting forth the basis for the declaration that the case is exceptional.

"(c) Compensations for attorneys' services in exceptional cases shall not exceed $5,000 per case. However, the board may approve additional compensation if warranted by the extreme complexity of the case."

Article 6.—REIMBURSEMENT OF EXPENSES

"**105-6-1. Reimbursement generally.** Appointed attorneys shall be reimbursed for expenses reasonably incurred in performance of duties when approved by the appropriate judge as provided in K.S.A. 1982 Supp. 22-4507(b). Expense reimbursements shall not be considered within the maximum amounts of compensation set out in K.A.R. 105-5-6 and K.A.R. 105-5-7."

"**105-6-2. Expenses allowed.** Expense reimbursements shall include, but not be limited to, reimbursement for the following expenses: (a) the cost of photocopying prepared briefs;

"(b) the cost of binding not more than 10 appeal briefs per case;

"(c) in-state travel and subsistence by appointed attorneys not to exceed the rate set by the secretary of the department of administration for state employees (K.S.A. 75-3201, et seq., and K.S.A. 75-4601, et seq.);

"(d) expenses incurred by appointed attorneys in obtaining a computerized legal research if the court finds that the case presents a unique question of law to be researched. Such expenses shall not exceed $100;

"(e) expenses incurred by appointed attorneys in taking depositions, if found to be authorized by statute and necessary in order to provide an adequate defense and when prior approval has been obtained from the court;

"(f) costs of mailing briefs; and

"(g) expenses incurred by appointed attorneys which would otherwise have

been approved and paid by the board directly to a third party in accordance with statute or rule and regulation."

Article 9.—CLAIMS GENERALLY

"105-9-1. General provisions. (a) All claims for payment for legal representation provided to an indigent defendant by attorneys, court reporters, investigators and all others shall be submitted to the board for payment not later than 60 days after the termination of services.

"(b) Unless otherwise specified, all claims that comply with these rules and regulations shall be processed for payment by the director.

"(c) Claims not conforming with rules and regulations prescribed by the board may be denied payment."

"105-9-2. Approval of claims. (a) Each claimant shall complete and sign the necessary claim forms and submit them to the court for approval.

"(b) The judge shall examine each claim and determine if it is reasonable and in accordance with rules and regulations adopted by the board. In determining the reasonableness, the judge shall consider the nature and complexity of the factual and legal issues involved and the time reasonably necessary to prepare and present the case.

"(c) The judge may reduce the amount of any claim submitted for approval."

"105-9-3. Claims from attorneys. Each claim from an attorney for compensation and reimbursement of allowable expenses shall be filed with the board on a voucher form approved by the board. Each claim shall be accompanied by a timesheet, in a form approved by the board, detailing:

"(a) the date of each compensable activity;

"(b) the purpose of the activity performed;

"(c) the type of activity performed;

"(d) the amount of time, in tenths of hours, spent on each activity; and

"(e) the amount of compensation received for the same services from any other source.

"105-9-4. Proration. *The board may prorate payment of claims in an equitable manner if the board determines that funding in any fiscal year is insufficient to pay all claims in full.*" (Emphasis supplied.)

## I. IS MANDAMUS A PROPER REMEDY?

The first issue facing us is whether mandamus is a proper remedy. Respondent Judge Smith, and *amici* Joe Herold and the Kansas Bar Association claim that mandamus is not proper in the case at bar. They rely on various authorities which note that mandamus is an extraordinary remedy which should not be used for a substitute for appeal or to control discretion, to correct errors, or revise judicial actions. See *State ex rel. Stephan v. O'Keefe,* 235 Kan. 1022, 1024, 686 P.2d 171 (1984); *U.S.D. No. 464 v. Porter,* 234 Kan. 690, 693-94, 676 P.2d 84 (1984); *Gray v. Jenkins,* 183 Kan. 251, 254, 326 P.2d 319 (1958).

Mandamus is defined by K.S.A. 60-801 as "a proceeding to compel some . . . person to perform a specified duty, which duty results from the office, trust, or official station of the party to whom the order is directed, or from operation of law." Relief in the form of mandamus is discretionary. *State ex rel. Stephan v. Carlin*, 229 Kan. 665, 666, 630 P.2d 709 (1981). In *State ex rel. Stephan v. Kansas House of Representatives*, 236 Kan. 45, 52, 687 P.2d 622 (1984), we described the circumstances in which mandamus may be appropriate:

"[M]andamus is an appropriate proceeding designed for the purpose of compelling a public officer to perform a clearly defined duty, one imposed by law and not involving the exercise of discretion. *Manhattan Buildings, Inc. v. Hurley*, 231 Kan. 20, Syl. ¶ 2. Numerous prior decisions have recognized mandamus is a proper remedy where the essential purpose of the proceeding is to obtain an authoritative interpretation of the law for the guidance of public officials in their administration of the public business, notwithstanding the fact that there also exists an adequate remedy at law. 231 Kan. 20, Syl. ¶ 4; *Mobil Oil Corporation v. McHenry*, 200 Kan. 211, 239, 436 P.2d 982 (1968), and cases cited therein. Where a petition for mandamus presents an issue of great public importance and concern, the court may exercise its original jurisdiction in mandamus and settle the question. *Berst v. Chipman*, 232 Kan. 180, 183, 653 P.2d 107 (1982)."

Determining whether or not an accused is indigent, whether an attorney is competent to represent the accused in a criminal proceeding, and whether an attorney has reasonably spent 10 or 100 hours representing a defendant in a criminal case are discretionary matters, not challenged here. The regulations quoted above, however, impose upon the courts several nondiscretionary duties. These include the preparation and maintenance of lists of eligible attorneys (though the determination of whether an attorney is competent to be on the list is discretionary) and the actual appointment of an attorney from that list after indigency has been determined. This action by the attorney general seeks an interpretation of the law to guide public officials; it concerns a matter of great public importance statewide.

Judge Smith also contends that the petition in the present case did not name all necessary respondents. He claims that the defendants in the four district court cases, mentioned above, are necessary parties under the provisions of Supreme Court Rule 9.01(b) (235 Kan. lxxvii), which provides in part:

"PETITION: SERVICE AND FILING. . . . Where the relief sought is an

order in mandamus against a judge involving pending litigation before such judge, the judge and all parties to the pending litigation shall be deemed respondents."

The petition in the present case names only Judges Smith and Fromme as respondents.

The quoted portion of Rule 9.01(b) applies to orders in mandamus against a judge *involving pending litigation.* The district court orders challenged by the State in this action are general orders governing the appointment of counsel for indigent defendants in two Kansas counties, a part of the Fourth Judicial District. The petitioner in this action is not attempting to appeal from or affect the decision of the district court in the four pending criminal cases; one or more of those cases is the subject of a separate appeal. Here, the attorney general challenges only the general orders, not specific orders made in the criminal cases. We hold that the defendants in the four criminal cases are not necessary parties to this litigation.

Finally, Judge Smith argues that mandamus is improper because the State is not clearly entitled to relief. See *State ex rel. Stephan v. O'Keefe,* 235 Kan. at 1025. Respondents claim that the orders in question were entered to protect constitutional rights of attorneys and criminal defendants. It is clear, however, that respondents did not comply with the requirements of the Kansas Statutes and Regulations quoted above, and that their rulings in entering the general orders quoted above present issues of compelling public importance. The issue before us ultimately is whether the statutory and regulatory requirements are constitutional and enforceable, and our ruling herein will provide an interpretation of the law to guide judges in the performance of their duties. We conclude that mandamus is an appropriate and proper means to present the issues in this action.

## II. THE OBLIGATION TO FURNISH COUNSEL.

The United States Supreme Court, in *Gideon v. Wainwright,* 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792 (1963), held that the Sixth Amendment's guarantee of counsel is made obligatory upon the states by the Fourteenth Amendment; thus, the State has a duty to provide counsel to an indigent criminal defendant who is charged with a felony in a state court. *In re Gault,* 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428 (1967), held that counsel

must be provided in juvenile proceedings which may result in commitment to an institution if the child and the parents are unable to afford an attorney. *Argersinger v. Hamlin*, 407 U.S. 25, 32 L. Ed. 2d 530, 92 S. Ct. 2006 (1972), extended that obligation to provide counsel to accused persons charged with misdemeanors, when imprisonment is a real possibility. The court held that, absent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether misdemeanor or felony, unless he or she was represented by counsel at trial. Mr. Justice Powell, in a concurring opinion, envisioned some of the difficulties and problems which are evident in the case at hand. He said:

"[I]t is said that there are presently 355,200 attorneys and that the number will increase rapidly, doubling by 1985. This is asserted to be sufficient to provide the number of full-time counsel, estimated by one source at between 1,575 and 2,300, to represent all indigent misdemeanants, excluding traffic offenders. It is totally unrealistic to imply that 355,200 lawyers are potentially available. Thousands of these are not in practice, and many of those who do practice work for governments, corporate legal departments, or the Armed Services and are unavailable for criminal representation. Of those in general practice, we have no indication how many are qualified to defend criminal cases or willing to accept assignments which may prove less than lucrative for most.

"It is similarly unrealistic to suggest that implementation of the Court's new rule will require no more than 1,575 to 2,300 'full-time' lawyers. In few communities are there full-time public defenders available for, or private lawyers specializing in, petty cases. Thus, if it were possible at all, it would be necessary to coordinate the schedules of those lawyers who are willing to take an occasional misdemeanor appointment with the crowded calendars of lower courts in which cases are not scheduled weeks in advance but instead are frequently tried the day after arrest. Finally, the majority's focus on aggregate figures ignores the heart of the problem, which is the distribution and availability of lawyers, especially in the hundreds of small localities across the country." 407 U.S. at 56-58.

All counsel in this case agree that the State of Kansas is required to furnish counsel to all indigent defendants charged in Kansas courts with felonies, as well as to certain defendants charged with misdemeanors, certain habeas corpus petitioners, probationers in probation revocation proceedings, and juvenile offenders in proceedings which may lead to commitment in an institution. That duty is imposed upon the states by *Gideon* and its progeny. Judge Smith emphasizes that the duty to provide counsel to indigent criminal defendants is imposed upon the

State. He notes that *Gideon* does not impose that duty on the private bar, and he argues that under the Indigent Defense Services Act, as presently administered, that duty is being borne by the private bar.

The latter argument has some merit. The evidence shows that while attorneys are being paid not to exceed $30 per hour for time spent on indigent appointments, the average office overhead of those attorneys who testified in the trial court exceeded $30 per hour. Thus, some private attorneys are actually losing money when the State pays them less than it costs to keep their offices open, and they realize nothing for their personal services. Additionally, the State was not, at the time of trial, paying in full the $30 per hour allowance or the actual out-of-pocket expenses of the attorneys. The State was cutting both fees and actual expenses by 12% at time of trial, thus requiring the appointed attorneys to pay out of their own pockets 12% of their expenditures for such things as photocopying, travel, and postage. We will treat this more fully under our discussion of the Fifth Amendment issues.

Judge Smith notes that the Sixth Amendment right to counsel is the right to *effective assistance of counsel.* This has been recognized by the United State Supreme Court. *Strickland v. Washington,* 466 U.S. 668, 686, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *McMann v. Richardson,* 397 U.S. 759, 771 n.14, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970); and see *State v. Walker,* 239 Kan. 635, 638-39, 722 P.2d 556 (1986) (quoting *Chamberlain v. State,* 236 Kan. 650, 656-57, 694 P.2d 468 [1985]). The argument is advanced that the system for appointing counsel adopted by the State violates the right to effective assistance of counsel for two reasons: (1) it creates an inherent conflict of interest between the attorney and client because the more hours an attorney spends on the case, the greater the personal cost to the attorney; and (2) it requires attorneys who are without criminal law experience or expertise to represent indigent criminal defendants.

The State responds that attorneys are ethically obligated to provide full and fair representation and that it is a sad commentary on the Kansas bar to claim that compensation affects quality of representation. This oversimplifies the situation. There is evidence that the attorneys in the less populous counties of

Anderson, Coffey, and Osage are being assigned many indigent cases annually; that the attorneys are repeatedly required to subsidize the defense of those accused of crime, and to do so at the risk of losing their regular or potential paying clients. The financial burdens thus created could well create a conflict of interest of the type proscribed by DR 5-101(A) of the Code of Professional Responsibility:

"Except with the consent of his client after full disclosure, a lawyer shall not accept employment if the exercise of his professional judgment on behalf of his client will be or reasonably may be affected by his own financial, business, property, or personal interests." 235 Kan. cxlv.

The problem is exacerbated if the attorney is subject to a contempt citation or disciplinary action for refusing an appointment.

The State did not specifically address respondents' argument that the rules require attorneys without criminal law experience or expertise to represent indigent defendants in criminal cases. Orally, the attorney general argued that it does not take any special skill to defend a criminal case, and that any attorney can adequately represent one charged with criminal offenses. We do not agree. While law schools teach criminal law and procedure, and graduates who take the bar examination must have some basic knowledge about criminal law and procedure, many attorneys do not regularly practice criminal law. New developments in the area of criminal law occur frequently, and one must keep up with these changes to be competent to practice in this area. Simply because one has a license to practice law does not make one competent to practice in every area of the law. DR 6-101(A) of the Code of Professional Responsibility provides that:

"A lawyer shall not:

"(1) Handle a legal matter which he knows or should know that he is not competent to handle . . . ." 235 Kan. cxlvii.

K.A.R. 105-3-2, quoted above, requires that all licensed attorneys engaged in private practice, with certain exceptions not here material, be included on the panel. The regulation includes no requirement of competency in the practice of criminal law, and includes no specific exception for those who do not have and maintain such competency, except that the administrative judge may make additional exceptions only "with the approval of the board." While the system thus creates the potential for ineffec-

tive assistance of counsel, there is no specific evidence in the record here of any deficient performance that adversely affected the outcome of a trial. See *Strickland v. Washington*, 466 U.S. 668, and *Chamberlain v. State*, 236 Kan. 650. Simply because the system *could* result in the appointment of ineffective counsel is not sufficient reason to declare the system unconstitutional; those rare cases where counsel has been ineffective may be handled and determined individually by the appellate courts. The judges should not put on the panel attorneys who are not competent to handle the particular litigation, nor should they appoint attorneys who are not competent to represent the indigent in the particular case. These are matters which must be handled, and we are confident will be and are being handled, by the judges in each district. The selection of attorneys for the panel or for appointment requires the exercise of judicial discretion. It is not a matter which may be handled by an administrative board, anything in the statutes or regulations to the contrary notwithstanding.

### III. THE JUDGE'S DUTY TO APPOINT COUNSEL.

What is the extent of the judge's duty to appoint counsel for indigent criminal defendants? K.S.A. 22-4503(c), quoted above, provides in substance that when the court determines that a defendant is indigent, "the court *shall* appoint an attorney from the panel for indigents' defense services or otherwise in accordance with the applicable system for providing legal defense services for indigent persons prescribed by the state board of indigents' defense services for the county or judicial district." Thus, while the *selection* of counsel is discretionary, the *appointment* of counsel is nondiscretionary.

The attorney general argues that respondents failed to perform this duty and that they unlawfully replaced the system created by statute and regulation with one of their own design. Respondents contend (1) that they merely refused to enforce unconstitutional enactments; (2) that they did not actually rescind the present system and replace it with one of their own design; and (3) that there is support in the rulings of this court for their action. As to the constitutional arguments, we will address them later in this opinion.

Judge Smith claims that he did not rescind or replace the

present system, and that he is willing to appoint attorneys at the present rate of compensation *if the attorneys are willing to provide services for that compensation.* He asserts that the State system remains in effect, but participation is voluntary on the part of the attorneys. He argues that he did not order the Board to pay $68 per hour, but merely determined that that amount was reasonable compensation, and that appointed counsel would not be required to serve unless they were paid at least that amount.

The general orders are not consistent with the statutory and regulatory system governing appointment of counsel. The regulations do not permit attorneys to decide whether they are willing to accept a case for the compensation fixed by the Board, nor do the regulations authorize judges to base appointments on attorneys' willingness to accept appointments at the specified rate of compensation. K.A.R. 105-3-3 requires appointments to be made in rotation from an alphabetical list of attorneys, with limited exceptions—not including an attorney's unwillingness to accept an appointment due to the limited compensation. The duty of the court to appoint counsel is clearly stated in the statutes and regulations; the general orders are in contravention of that mandate.

Similarly, the regulations do not permit the court to determine the rate of compensation; they require compensation at the rate of $30 per hour, subject to certain mandatory caps and subject to reduction when adequate funds are not available. K.A.R. 105-5-1; 105-5-2; 105-5-6 (1986 Supp.); 105-5-7. While the judge did not order the Board to pay $68 per hour, he did refuse to enforce what appears to be mandatory service requirements on attorneys unwilling to work for the specified rate of compensation. This circumvents the statute, and amounts to a failure to perform a nondiscretionary duty. Moreover, the impact on criminal prosecutions in the district could be severe in light of the general order that cases will be dismissed if "reasonable compensation" is not forthcoming from the Board. The object of the order is obviously to apply leverage to the State to provide "reasonable compensation" for appointed counsel.

The language relied upon by respondent to support the general order is that appearing in *Clark v. Ivy*, 240 Kan. 195, 204, 727 P.2d 493 (1986):

"The executive branch is not infringing herein upon the judicial branch. *A judge may appoint any attorney he or she pleases who is capable of adequately representing a defendant providing, of course, the attorney accepts the appointment.*" (Emphasis supplied.)

The quotation would seem to support the district court action; however, it is taken out of context. The opinion goes on:

"It is only where compensation for the services of such appointed attorney is expected to be paid from state monies that compliance with the Board's programs, standards, and policies becomes involved. The position of petitioners that review of claims of appointed counsel by the Board and rejection thereof, if not in compliance with the programs, standards, and policies of the Board, is a violation of the separation of powers doctrine is both legally and logically untenable." 240 Kan. at 204.

The dispute in *Clark* arose from the judges' appointment of private counsel instead of available public defenders to represent indigent criminal defendants. The private counsel submitted requests for payment to the Board which were denied on the basis that the appointments were not made in compliance with statutes and regulations. In the language quoted by respondents, this court was merely explaining that the judge could still appoint any attorney he or she chose, but if the attorney were to be paid with state funds, the appointment must comply with state regulations. The court was not making a general statement that appointments could or should be made based on competence and willingness and that the Board would be obligated to foot the bill regardless of compliance with statutes and regulations.

The general orders entered by Judges Smith and Fromme contravene the statutes and regulations governing appointment of counsel for indigent defendants. The judge has a duty, under the statute and regulations, to appoint counsel for indigent defendants. The indigent defendant has a right to competent counsel, and thus the trial judge has a duty to determine that the appointee is competent to handle the matter for which he or she is appointed. The indigent defendant, however, has no right to adequately paid counsel; the defendant has no right to demand that the State provide "reasonable compensation" for his or her attorney; the level of compensation is to be determined by the judge. As the facts here illustrate, "reasonable compensation" might well vary from district to district, and from judge to judge

within the same district. Under the facts contained in the record, we hold that the "general orders" issued by Judges Smith and Fromme violate the duty to appoint counsel set forth in the statutes and regulations. Whether the regulations are constitutional, however, we will address later in this opinion.

IV. THE DUTY OF KANSAS ATTORNEYS.

Do Kansas attorneys have a duty to represent indigent criminal defendants? In support of this claim, the State alleges that members of the Kansas bar have an ethical obligation and a statutory duty to represent indigent criminal defendants for little or no compensation. The source of the ethical obligation is Canon 2 of the Code of Professional Responsibility:

"A Lawyer Should Assist the Legal Profession in Fulfilling its Duty to Make Legal Counsel Available." 235 Kan. cxxxviii.

The Model Rules of Professional Conduct, adopted by the House of Delegates of the American Bar Association on August 2, 1983, also make the obligation on the individual attorney an ethical one rather than a mandatory and enforceable duty. Model Rule 6.1 states in part: "A lawyer should render public interest legal service." The obligation is discussed in a series of articles in *Pro Bono Publico*, 73 A.B.A. J. 55-73 (December 1, 1987).

The statutory duty is imposed by the Indigent Defense Services Act. Specifically, see K.S.A. 22-4501(b) and 22-4503(d), both set out above. The State also relies upon *State v. Keener*, 224 Kan. 100, 102, 577 P.2d 1182, *cert. denied* 439 U.S. 953 (1978), where we said:

"It is the moral and ethical obligation of the bar to make representation available to the public. (See, Canon 2, Code of Professional Responsibility, 220 Kan. cx.) Quite often, fulfillment of that obligation involves the representation of a client, particularly a criminal defendant, for little or no remuneration. Enactment of K.S.A. 22-4501, *et seq.*, has served to relieve some of the hardships involved in fulfilling an attorney's obligation to provide legal representation to the public; but it has not cancelled the attorney's ethical responsibility to provide representation without compensation if necessary. Court appointed counsel has no constitutional right to be compensated, much less to receive full and adequate compensation which may have been received if the same time had been spent on a fee-paying client's problems. (See, *United States, v. Dillon*, 346 F.2d 633 [9th Cir. 1965].)"

This language was later quoted with approval in *Clark v. Ivy*, 240 Kan. at 202; and *City of Overland Park v. Estell & McDiffett*, 225 Kan. 599, 604-05, 592 P.2d 909 (1979).

The court in *Keener* was not faced with the precise issues which face this court today. The issue in *Keener*, which was resolved with the quoted language, was whether an indigent defendant had a constitutional right to adequately compensated counsel. We held that the constitution provided no such right. Keener's counsel had submitted to the Board of Supervisors of Panels to Aid Indigent Defendants a claim voucher for the time and expense involved in the defense of the case. The Board reduced the claim and made an award; a later attempt by counsel to obtain an additional award was denied. The ethical and constitutional questions raised in the present proceeding go far beyond the narrow issue in *Keener*.

Similarly, the issue in *City of Overland Park* was much narrower than the issues in this action. *City of Overland Park* concerned a dispute over the appointment and payment of counsel for indigent defendants in an appeal to the district court from the municipal court. K.S.A. 12-4405 required the municipal court to appoint counsel but was silent as to payment. It had been the custom of the municipal court to pay appointed counsel on some undisclosed basis. We held that the district court should determine a reasonable fee for the services, and that the city would ultimately be responsible for such expense.

*Clark v. Ivy*, 240 Kan. 195, has been previously discussed. Its primary thrust was that if the appointed attorney was to be paid from state funds, the appointment must be made in accordance with state procedures. These cases are all distinguishable from the case at bar, and we do not find the *Keener* language fully determinative of the issue presently before us.

Respondents argue that Canon 2 does not require attorneys in private practice to represent indigent defendants for less than a reasonable fee. Such a requirement is difficult to find in the language of the Canon. However, it is also argued that Canon 2 applies to all attorneys, yet the burden of providing a defense to indigent defendants at less than fair compensation is mandatorily imposed upon less than one-third of the Kansas bar. Also, it is argued that the language of Canon 2 is not mandatory, but voluntary. Canon 2 states that a lawyer "should," not "shall," assist in making legal counsel available. This court has not

imposed a minimum number of hours of pro bono work upon the bar, suggesting that the requirement is voluntary by leaving the amount of pro bono work up to the individual attorney. Further, there are no disciplinary rules under Canon 2 requiring pro bono work. Casting the ABA's Canon 2 in aspirational rather than mandatory language was apparently the product of a conscious decision following much debate and the consideration of mandatory alternatives. See Shapiro, *The Enigma of the Lawyer's Duty to Serve,* 55 N.Y.U. L. Rev. 735, 735-39 (1980).

Orville Cole offers two arguments: (1) the obligation imposed by the State ignores the realities of modern day criminal law practice, and (2) such an obligation has no historical basis in the American legal system. In support of the first argument, he contends that the inherent conflict of interest created between attorney and client precludes the effective assistance of counsel. His second argument is that the tradition of requiring pro bono work of attorneys originated in common-law England where attorneys who were expected to provide such representation also enjoyed special rights and privileges. They were the serjeants-at-law, the elite among all English lawyers. They had special practice privileges, they commanded higher fees, and judges were selected exclusively from their ranks. They were actually public officers and were sometimes paid by the government. See generally 55 N.Y.U. L. Rev. at 746. As officers of the court, English lawyers were exempt from suit, military service, and other compelled public service. See *Cunningham v. Superior Court,* 177 Cal. App. 3d 336, 345, 222 Cal. Rptr. 854 (1986). Their modern American counterparts enjoy no such special privileges. The distinction and its consequences were recognized by the Indiana Supreme Court as early as 1854:

"The legal profession having been thus properly stripped of all its odious distinctions and peculiar emoluments, the public can no longer justly demand of that class of citizens any gratuitous services which would not be demandable of every other class. To the attorney, his profession is his means of livelihood. His legal knowledge is his capital stock. His professional services are no more at the mercy of the public, as to remuneration, than are the goods of the merchant, or the crops of the farmer, or the wares of the mechanic. The law which requires gratuitous services from a particular class, in effect imposes a tax to that extent upon such class—clearly in violation of the fundamental law, which provides for a uniform and equal rate of assessment and taxation upon all the citizens." *Webb v. Baird,* 6 Ind. 13, 17 (1854).

The *Webb* opinion proceeds to note that if a prisoner is brought into court not decently clad, and too poor to provide for himself, the court would have the power and duty to order suitable clothes for him. Similarly, a coroner is authorized to employ a physician to perform a post-mortem examination, although there was no Indiana statute authorizing such employment. The county, however, was held obligated to pay for the services of the attorney, the clothing furnished by a merchant, and the examination performed by the physician. The court noted that an attorney is under no obligation, honorary or otherwise, to volunteer his services; it devolves as much on any other citizen of equal wealth to employ counsel in the defense as on the attorney to render services gratuitously. Thus, the court concluded that the county, which bears the expense of the prisoner's support, imprisonment, and trial, should also be chargeable with his defense.

In 55 N.Y.U. L. Rev. at 756, it is found that 35 American jurisdictions had addressed the question of whether free indigent defense services is an enforceable duty upon the private bar. In a bare majority, eighteen jurisdictions, the law imposed an unqualified enforceable duty. Many of the cases cited, attributed to the eighteen majority jurisdictions, predate the turn of the century. One state, Alaska, has since overruled its former "majority" case, *Jackson v. State*, 413 P.2d 488 (Alaska 1966), and now holds that a private attorney cannot be compelled to represent indigent criminal defendants without just compensation. *De Lisio v. Alaska Superior Court*, 740 P.2d 437 (Alaska 1987). The pendulum has swung, and the "bare majority" now holds that free indigent defense services is not an enforceable duty of the private bar.

The duty of attorneys who are members of panels for indigents' defense services is fixed by K.S.A. 22-4501(b) and K.S.A. 22-4503(d). Attorneys generally have an *ethical* obligation to provide pro bono services for indigents. Such services may only be provided by attorneys. The individual attorney has a right to make a living. Indigent defendants, on the other hand, have the right to the effective assistance of counsel. The obligation to provide counsel for indigent defendants is that of the State, not of

the individual attorney. The adjustment of these rights and obligations presents the primary difficulty of the present statutory system. The burden must be shared equally by those similarly situated. In the final analysis, it is a matter of reasonableness.

We will further consider the duty and obligation of attorneys later in this opinion, during our discussion of the constitutional issues raised.

## V. DOES THE STATE HAVE A DUTY TO COMPENSATE COUNSEL FOR INDIGENT DEFENDANTS?

What is the extent of the government's duty to compensate attorneys who represent indigent criminal defendants? The State argues that the attorneys have a duty to provide such representation and that the government has no obligation to pay for such representation. In support of its claim that the State has no duty to pay compensation, the State relies on *Clark v. Ivy*, 240 Kan. at 202. *Clark* determined only that if attorneys are to be paid, the appointment must be made in conformity with state statutes and regulations. It did not determine generally the obligation of the State to pay compensation. The State also relies upon the decision in *Case v. Board of County Commissioners*, 4 Kan. *511, *513-14 (1868), where this court held that while the law made provision for the appointment of counsel by the district court, it made no provision for the payment of counsel, and there was no obligation on the part of the county to pay the attorney who had been appointed to represent an indigent defendant. The decision in *Case* was based upon the absence of any statute authorizing compensation. *Case* was decided before *Gideon* imposed upon the State the duty to provide counsel for indigent defendants and before the enactment of K.S.A. 22-4501 *et seq.* The authority to pay compensation lacking in 1868 exists today, and the entire legal and economic picture has changed.

*Case* was decided almost 120 years ago. There, the burden placed on one attorney to defend one larceny case without compensation may well have been reasonable under the existing circumstances. Fewer areas then required counsel; there were fewer cases; the Supreme Court had not recognized the appointment of counsel as a constitutional right in a variety of situations; the criminal law was less complex; and counsel's

overhead was no doubt minimal compared to the present day attorney's fixed expenses which now include professional liability insurance, unheard of in the nineteenth century and even as late as the 1950's. Whether the attorney in *Case* had any other appointed cases for indigent defendants is not shown. Here, attorneys in the less populous counties are required to take several indigent appointments each month. Some, such as Cole's appointed representation of Buckridge, take an inordinate amount of time; meanwhile, counsel's fixed expenses and overhead continue. We do not find *Case* persuasive today, and we specifically overrule it. We hold that the State has an obligation to compensate attorneys appointed to represent indigent defendants accused of crime. As the New York court said in *Menin v. Menin*, 79 Misc. 2d 285, 288, 359 N.Y.S.2d 721 (1974):

"Nowhere in the right to counsel cases does the Supreme Court state that counsel must be assigned to serve without compensation (*Gagnon v. Scarpelli*, 411 U.S. 778; *Argersinger v. Hamlin*, 407 U.S. 25; *Coleman v. Alabama*, 399 U.S. 1; *Goldberg v. Kelly*, 397 U.S. 254; *Johnson v. Avery*, 393 U.S. 483; *Matter of Gault*, 387 U.S. 1; *Gideon v. Wainwright*, 372 U.S. 335; *Powell v. Alabama*, 287 U.S. 45). Indeed, in the very recent decision in *Gagnon v. Scarpelli*, (*supra*), wherein the court considered the right to counsel in parole and revocation situations, it was noted that one factor to be emphasized in requiring assistance of *appointed* counsel is (p. 788) 'the financial cost to the State'. Implicit in the above statement is the requirement of payment for assigned legal representation . . . ."

## VI. THE FIFTH AMENDMENT ISSUE.

The next issue is whether the present system of appointing and compensating attorneys for indigent criminal defendants violates the Fifth Amendment of the United States Constitution, which provides in pertinent part:

"No person shall . . . be deprived of . . . property, without due process of law; nor shall private property be taken for public use, without just compensation."

Most of the briefs characterize their Fifth Amendment arguments as a "due process" issue. Several, under the heading of due process, also argue that the State is taking private property for public use without providing just compensation. Both arguments are based on the claim that attorneys may not be required to provide legal services without just compensation.

Whether a violation of due process has occurred depends upon

whether "property" has been taken and upon what kind of "process" is due. Neither question is particularly easy to answer. Many courts have struggled with the question of whether the taking of an attorney's services amounts to a taking of *property*. Attorneys' services are their livelihood, and conscripting their services is akin to taking the goods of merchants or the taking of the services of an architect, engineer, accountant, or physician. An attorney's advice and counsel is indeed his or her stock in trade. Moreover, when attorneys are required to donate funds out-of-pocket to subsidize a defense, they are deprived of property in the form of money.

What is required by due process is even more nebulous. In 1973, this court noted:

"The term due process refers primarily to the methods by which the law is enforced; however the term has no fixed technical concept unrelated to time, place and circumstances. In *Hanna v. Larche*, 363 U.S. 420, 4 L. Ed. 2d 1307, 1321, 80 S. Ct. 1502, 1514, this comment was made:

" ' "Due process" is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts. . . . Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding are all considerations which must be taken into account.' " *Smith v. Miller,* 213 Kan. 1, 7, 514 P.2d 377 (1973).

This court has held that the essence of due process is protection against *arbitrary* government action. *Baker v. List and Clark Construction Co.,* 222 Kan. 127, 134, 563 P.2d 431 (1977). The test for whether due process has been afforded is whether the legislation has a real and substantial relation to the objective sought, whether it is reasonable in relation to the subject, and whether it was adopted in the interest of the community. *Manhattan Buildings, Inc. v. Hurley,* 231 Kan. 20, 30, 643 P.2d 87 (1982).

The factual basis for the attorneys' claims is briefly as follows. The overhead of four attorneys who testified ranged from $27.10 to $35.71 per hour. This figure would include the cost of office, library, equipment, supplies, professional liability insurance, and secretarial help, all of which would be utilized in serving as counsel for an indigent defendant. The statutory and regulatory system permits compensation at the rate of $30 per hour, up to a

maximum of $400 if the case does not proceed to trial, and $1,000 if it does proceed to trial. Attorneys are allowed reimbursement for certain expenses reasonably incurred, and such expenses are not applied toward the maximum amounts described above. However, a 12% cut was imposed on fees and expenses at the time of trial, requiring attorneys to make up the difference out-of-pocket. The attorneys argue that they lose money on each criminal appointment because allotted fees do not cover overhead or all expenses. In addition to the out-of-pocket losses, they presumably lose fees they could be receiving from paying clients and may lose clients as a result of repeated criminal appointments. The extent of the problem is illustrated by one attorney's testimony that he had eleven indigent appointments in six months; by other testimony that in Osage County, the average number of criminal appointments per attorney in 1986 was between 16 and 24; and by the testimony of another attorney that he was appointed in a major case and devoted 90% of his professional time to the case for three months. The payment he received was the approximate amount of his office overhead for that period. There was no testimony as to how much time was required on the average appointment.

Requiring attorneys to donate a reasonable amount of time to indigent defense work bears a real and substantial relation to the legitimate government objective sought—protection of indigent defendants' Sixth Amendment right to counsel. Such a requirement may also be reasonable in light of the general ethical responsibility of lawyers to make legal services available. Clearly the Indigent Defense Services Act was adopted in the interest of the community. Under such an analysis, the statute on its face does not violate due process.

There are some problems with the application or administration of the present statutory system, however, which could render it unreasonable and arbitrary. One problem is with the unequal operation of the statute—it affects attorneys differently depending upon where they live. Some attorneys in the three counties here involved seem to be required to donate an unreasonable amount of time and money. While this is really an equal protection concern, it may also bear on the due process issue as it relates to arbitrariness and unreasonableness. Some of the dis-

parate impact is attributable to the nature of the system and some is due to the manner in which it has been applied. The Board did not consider the cost of providing services or the cost of overhead when it developed the regulatory fee schedule. Despite an increase of 19% in the caseload of court-appointed counsel over the last four years, the funds available have not kept up with inflation. Finally, the 12% cut in money for fees and expenses was applied only against the appointed counsel fund, not the fund which supports the public defender offices.

The second prong of the Fifth Amendment challenge is that the present system takes private property for a public purpose without providing just compensation. Requiring pro bono service of attorneys serves a public purpose—the State's duty to provide counsel for indigent defendants. This clause of the Fifth Amendment has traditionally been applied to limit the State's powers of eminent domain. In *Steck v. City of Wichita,* 179 Kan. 305, 313, 295 P.2d 1068 (1956), this court defined taking under this clause as "acquiring of possession and the right of possession and control of *tangible* property to the exclusion of the former owner." (Emphasis added.) If the property at issue is services, then it is not tangible property and is not protected by the clause. On the other hand, if the property taken is viewed as· the attorneys' money, it is tangible property and may be protected by the clause. Under the facts presented to the district court, it appears the attorneys are required to donate at least some personal funds (12% of the actual expenses) and it costs them money in the form of overhead to provide indigent defense services.

Other courts have struggled with similar Fifth Amendment challenges. George L. Partain brought suit challenging the West Virginia state system of appointing counsel. He claimed that he was spending over 16% of his professional time in the defense of court-appointed cases; his overhead expenses allocable to that practice exceeded payments received from the state; he was required to make out-of-pocket payments without reimbursement; and the cumulative effect constituted an undue burden upon him. In response to Partain's due process challenge, the West Virginia Supreme Court of Appeals held the system violated the attorneys' due process rights and ordered that lawyers

would no longer be required to accept appointments. *State ex rel. Partain v. Oakley,* 159 W.Va. 805, 808, 822, 227 S.E.2d 314 (1976). In reaching this conclusion, the court agreed with the majority of jurisdictions which have held that it is not a violation of due process to require an attorney to donate time to represent indigent defendants. The court held, however, that when the attorney has so many appointments that it interferes with his ability to "engage in the remunerative practice of law," or the costs associated with such defenses substantially reduce the attorney's net income, "the requirements must be considered confiscatory and unconstitutional." 159 W.Va. at 813-14.

The court concluded that West Virginia attorneys were suffering such substantial losses. The court noted that attorneys handled an average of 6 appointments per year with substantial regional variation (from 2-4 to 13-16). Average payment was $164.00 per case, with a maximum of $200 available. The court also considered and discussed in detail several factors which contributed to the increasing demands on appointed counsel. Of particular importance were the increases in criminal activity, the breadth of the right to counsel, and the complexity of criminal defense work. The court stayed the entry of its order until the following July in order to allow the legislature to take the necessary action.

Along similar lines, two courts have held that, in particular cases, the losses borne by particular attorneys were so great as to be unconstitutional. In each case, however, the court declined to declare the system for payment unconstitutional on its face, but directed the payment of substantial fees and reimbursement of expenses. *People ex rel. Conn v. Randolph,* 35 Ill. 2d 24, 219 N.E.2d 337 (1966); *Bias v. State,* 568 P.2d 1269 (Okla. 1977).

In *Bradshaw v. Ball,* 487 S.W.2d 294 (Ky. 1972), the Kentucky Court of Appeals held that requiring attorneys to represent indigent defendants for no compensation constituted a substantial deprivation of property without just compensation. 487 S.W.2d at 298. Similarly, in *McNabb v. Osmundson,* 315 N.W.2d 9 (Iowa 1982), a case where the Iowa Constitution required the appointment of counsel but where there was no statutory authorization for appointment or compensation, the Iowa Supreme Court held that attorneys cannot constitutionally be compelled to

represent indigent defendants without compensation. 315 N.W.2d at 16. The court did not, however, expressly state that counsel was entitled to reasonable compensation. The court held that fees were to be fixed in accordance with statutory guidelines applicable to statutory appointments. 315 N.W.2d at 17.

*Williamson v. Vardeman,* 674 F.2d 1211 (8th Cir. 1982), is cited in support of the Fifth Amendment arguments. That court held that requiring an attorney to represent indigent criminal defendants without compensation did not constitute a taking of property without just compensation. The court found a Fifth Amendment violation (implied through the Fourteenth Amendment), however, with requiring the attorney to advance and pay defense expenses out-of-pocket.

The Arkansas Supreme Court upheld an act of that state's legislature limiting compensation of appointed attorneys to $350 plus $100 for investigation expense. *State v. Ruiz & Van Denton,* 269 Ark. 331, 602 S.W.2d 625 (1980). The court said: "[The] question of adequate compensation is not a matter to be addressed by the court but is within the province of the legislature." 269 Ark. at 335.

At least two courts have held that limiting compensation to the amount allowed by the legislature, at least in the absence of extraordinary circumstances, does not violate the Fifth Amendment. *Daines v. Markoff,* 92 Nev. 582, 555 P.2d 490 (1976); *Keene v. Jackson County,* 3 Or. App. 551, 474 P.2d 777 (1970). Both courts based their decision on the finding that the professional obligation of the bar to represent the indigent accused is an incident to the privilege of practicing law and does not offend the Constitution. 92 Nev. at 587; 3 Or. App. at 553-54.

*DeLisio v. Alaska Superior Court,* 740 P.2d 437 (Alaska 1987), was a direct due process challenge to Alaska's system of appointing private counsel for indigent defendants in criminal cases. Argument was made under the Fifth and Fourteenth Amendments to the United States Constitution and under Article 1, § 18 of the Alaska Constitution that requiring an attorney to represent an indigent defendant without reasonable compensation is a taking of private property for a public use. The Alaska court had previously rejected the same argument on two prior occasions. In *DeLisio,* it reversed its prior decisions and held

that the Alaska constitutional provision that "[p]rivate property shall not be taken or damaged for public use without just compensation" prevented forcing an attorney to represent an indigent defendant for less than "the compensation received by the average competent attorney operating on the open market." 740 P.2d at 443. In concluding its decision, the court said:

"The Model Rules [of Professional Conduct] . . . express a policy favoring public service and affirming the profession's ethical obligation to ensure representation of those in need. We cannot emphasize too strongly our support for this position. Attorneys *should* be willing to undertake pro bono representation. We applaud those attorneys who voluntarily accept this obligation and deeply regret that there are those who refuse to do so. Yet we are reluctantly persuaded that this ethical obligation, important as it is, cannot justify the practice of compelled gratuitous representation." 740 P.2d at 444.

Several courts have addressed the issue of compensation without expressly addressing constitutional challenges. The Nebraska Supreme Court has held that appointed counsel is entitled to reasonable compensation, though it did not address the precise due process arguments presented herein. In *Kovarik v. County of Banner*, 192 Neb. 816, 224 N.W.2d 761 (1975), the court held that attorneys appointed by county courts were entitled to reasonable compensation and expenses. 192 Neb. at 823. There was no statute governing appointment or payment of such counsel and the court based its holding on an implied obligation on the part of the recipient (*i.e.*, the public) to pay for services rendered. 192 Neb. at 822.

Still other courts have held that appointed counsel should not have to bear the *entire* burden for providing counsel to indigent defendants and are entitled to something which may be described as "fair" compensation. In *State ex rel. Wolff v. Ruddy*, 617 S.W.2d 64 (Mo. 1981), the funds appropriated by the legislature having been exhausted, the court issued temporary guidelines until the problem of compensation could be resolved. In the final guideline, the court advised members of the bar that for a reasonable time pending resolution of the problem, the court would decline applications for extraordinary relief and expected the bar to honor its obligation to the "defenseless" and the "oppressed" with "complete confidence that this Court will do all within its power to protect the rights of indigent accused

and to implement the public policy . . . that those ordered to defend the indigent accused shall be *fairly compensated* for their expenses and services." 617 S.W.2d at 67-68. (Emphasis added.)

In 1985, the Missouri Supreme Court held that Missouri courts had no inherent power to appoint counsel or to compel attorneys to serve in civil actions without compensation. *State ex rel. Scott v. Roper*, 688 S.W.2d 757, 769 (Mo. 1985). While *Roper* involved appointment in a civil case, the opinion presents a comprehensive analysis of the historical basis for providing free legal services to indigents, the evolving controversy in American jurisdictions regarding the requiring of such services, the ethical obligation of attorneys to provide such services, and various changes which have affected the burden on appointed counsel. See 688 S.W.2d at 759-69. As the Alaska Supreme Court observes in *DeLisio*, 740 P.2d at 441, the Missouri court's opinion in *Roper* "dispels many assumptions which have been frequently repeated in cases addressing this issue."

In the case of *In Interest of D.B.*, 385 So. 2d 83 (Fla. 1980), the Florida Supreme Court stated the bar should not bear the entire fiscal burden for the state's responsibility to provide counsel in juvenile dependency proceedings. The court held that *in the absence of a statutory formula*, attorneys should be compensated at 60% of the fee that a client of ordinary means would pay an attorney of modest financial success. This formula was based on the assumption that in the average law firm, overhead amounted to about 40% of gross income. 385 So. 2d at 92. See *State v. Rush*, 46 N.J. 399, 412-13, 217 A.2d 441 (1966), the source of the formula adopted by the Florida court.

The later cases reflect a definite trend toward recognizing that the historical conditions from which the duty to provide free legal services evolved no longer exists in modern America. Courts recognize that diminution of the status of the bar, increased crime, increased scope of the right to counsel, increased complexity of criminal defense work, increased specialization, and increased costs in the legal profession have substantially increased the burden on the private bar. These are the exacerbating factors.

While some jurisdictions adhere to the notion that attorneys

may be required to provide free legal services, *Williamson v. Vardeman*, 674 F.2d 1211; and *State v. Ruiz & Van Denton*, 269 Ark. at 335, other jurisdictions have found that requiring attorneys to provide representation without compensation violates the Fifth Amendment. *Bradshaw v. Ball*, 487 S.W.2d 294; *McNabb v. Osmundson*, 315 N.W.2d 9. The emerging view is that the responsibility to provide the Sixth Amendment right to counsel is a public responsibility that is not to be borne *entirely* by the private bar.

The judiciary across the nation has struggled to find the appropriate balance between the ethical obligation of the legal profession to make legal services available and the rights of attorneys to just compensation. Some jurisdictions have determined that attorneys are entitled only to the amount allowed by the legislature. *Daines v. Markoff*, 92 Nev. 582; *Keene v. Jackson County*, 3 Or. App. 551. Other jurisdictions accept this notion generally, but permit exceptions when extraordinary conditions result in an extreme financial loss to the local bar, *State ex rel. Partain v. Oakley*, 159 W.Va. 805, or to attorneys in particular cases. *People ex rel. Conn v. Randolph*, 35 Ill. 2d 24; *Bias v. State*, 568 P.2d 1269. One jurisdiction holds that attorneys are entitled to reasonable compensation, but in that case there was no statute governing compensation. *Kovarik v. County of Banner*, 192 Neb. 816. Finally, two jurisdictions hold that attorneys are entitled to "fair" compensation. *State ex rel. Wolff v. Ruddy*, 617 S.W.2d 64; *In Interest of D.B.*, 385 So. 2d 83.

Our analysis of the Fifth Amendment arguments is this: Attorneys, like the members of any other profession, have for sale to the public an intangible—their time, advice, and counsel. Architects, engineers, physicians, and attorneys ordinarily purvey little or nothing which is tangible. It is their learned and reflective thought, their recommendations, suggestions, directions, plans, diagnoses, and advice that is of value to the persons they serve. It is not the price of paper on which is written the plan for a building or a bridge, the prescription for medication, or the will, contract, or pleading which is of substantial value to the client; it is the professional knowledge which goes into the practice of the profession which is valuable.

Attorneys are licensed by the state to practice their profession;

but so are other professionals, such as architects, engineers, and physicians. One who practices his profession has a property interest in that pursuit which may not be taken from him or her at the whim of the government without due process. An attorney or a physician who is the target of disciplinary proceedings is entitled to procedural due process: to prior notice of the charges made and to an opportunity to be heard, to appear, and to defend. *Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975); *In re Ruffalo,* 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968).

Attorneys make their living through their services. Their services are the means of their livelihood. We do not expect architects to design public buildings, engineers to design highways, dikes, and bridges, or physicians to treat the indigent without compensation. When attorneys' services are conscripted for the public good, such a taking is akin to the taking of food or clothing from a merchant or the taking of services from any other professional for the public good. And certainly when attorneys are required to donate funds out-of-pocket to subsidize a defense for an indigent defendant, the attorneys are deprived of property in the form of money. We conclude that attorneys' services are property, and are thus subject to Fifth Amendment protection.·

When the attorney is required to advance expense funds out-of-pocket for an indigent, without full reimbursement, the system violates the Fifth Amendment. Similarly, when an attorney is required to spend an unreasonable amount of time on indigent appointments so that there is genuine and substantial interference with his or her private practice, the system violates the Fifth Amendment.

VII. THE SEPARATION OF POWERS ISSUE.

The respondents contend that the system violates the doctrine of separation of powers because it allows the legislative and executive branches to infringe upon the exclusive power of the judiciary to regulate the practice of law. The State contends this court has already held to the contrary in *Clark v. Ivy,* 240 Kan. 195, 727 P.2d 493 (1986).

While *Clark* did reject a separation of powers challenge to the Indigent Defense Services Act, the argument in *Clark* differs significantly from the present challenge. In *Clark,* private attor-

neys who were appointed outside the procedures defined in the Act were denied reimbursement by the Board. Petitioners, district judges, sought a writ of mandamus to compel the Board to perform its mandatory duty to pay appointed counsel. Petitioners claimed that the Act violated the separation of powers doctrine by infringing upon the judges' right to appoint counsel of their choice. This court rejected that claim, finding there was no mandatory duty to pay bills submitted by counsel who were not appointed in conformity with the Act. The court also properly found the Act did not infringe upon the judges' discretion regarding whom to appoint, noting judges could still *appoint* any attorney they chose, but the State only had to *pay* those attorneys appointed in conformity with the law.

The present challenge is that the executive branch is infringing on judicial authority by compelling judges to use their powers of contempt and disciplinary action to require attorneys to serve involuntarily. Counsel notes that the judiciary has the exclusive power to supervise, regulate, and control the practice of law, and that statutory regulation is effective and directory only when it is in accord with the power of the judiciary. *Martin v. Davis,* 187 Kan. 473, Syl. ¶ 4, 357 P.2d 782 (1960); see *Hanson v. Grattan,* 84 Kan. 843, 846-47, 115 Pac. 646 (1911). The power to regulate the bar, including the power to discipline its members, rests inherently and exclusively with this court. *State v. Schumacher,* 210 Kan. 377, 382, 502 P.2d 748 (1972); *In re Gorsuch,* 113 Kan. 380, 384, 217 Pac. 794 (1923). The laws and regulations now in question require judges to appoint attorneys in a certain manner and require attorneys to serve when appointed. Nothing in the statute requires the judiciary to use its powers of contempt or disciplinary action against a noncompliant attorney. The matters of contempt or discipline are left exclusively for the courts. Neither the legislative nor the executive branches are infringing upon that judicial power.

It is also argued that the power to regulate the bar includes the exclusive power to determine reasonable fees, and that the determination of "reasonableness" is a judicial function, citing *Lira v. Billings,* 196 Kan. 726, 730-31, 414 P.2d 13 (1966). In *Billings,* we held that the "reasonableness" of a refusal to submit to a chemical test for blood alcohol content was the issue to be

determined by a district court or a jury in a driver's license revocation appeal. The fixing of fees for appointed attorneys, to be paid from appropriations of public funds, however, involves many considerations and is not wholly judicial. The executive branch must estimate the need and present a budget to the legislature, which appropriates the necessary funds.

*Smith v. State*, 118 N.H. 764, 394 A.2d 834 (1978), is also cited in support of the position that only the courts should determine reasonable compensation for court-appointed attorneys. The New Hampshire court held that the judiciary had the authority to determine reasonable fees and held the statutory limits on compensation were invalid because they infringed on the exclusive powers of the court. The relevant New Hampshire statute, however, provided that court-appointed attorneys "shall be reasonably compensated." The court explained that absent an agreed price, it was for the court to determine what was reasonable. Significantly, however, the court found that the courts had inherent power to determine compensation for court-appointed attorneys, saying:

"Since the obligation to represent indigent defendants is an obligation springing from judicial authority, so too is the determination of reasonable compensation for court-appointed attorneys a matter for judicial determination. *The power to regulate officers of the court is a power inherent in the judicial branch. Implicit in that power is the authority to fix reasonable compensation rates for court-appointed attorneys. The legislature recognized this authority in enacting RSA 604-A:4, which provides that '[e]ach court before which the counsel represented the defendant shall fix the compensation and reimbursement to be paid the counsel.'* Thus, we hold that it is for the trial courts of New Hampshire to fix the amount of compensation due in each case hereinafter provided. The rate awarded by the court should neither unjustly enrich nor, as the present fee schedule does, unduly impoverish the court-appointed attorney." 118 N.H. at 770. (Emphasis added.)

Contrary authority is found in *State v. Ruiz & Van Denton*, 269 Ark. at 335:

"We do not imply that the present statutory allowances even come close to providing adequate compensation for the services performed in this case. *However, this question of adequate compensation is not a matter to be addressed by the court but is within the province of the legislature.*" (Emphasis supplied.)

Under our present statutory and regulatory scheme, the system is quite flexible. The Board for Indigents' Defense Services fixes

an hourly rate, to apply statewide. We emphasize that the hourly rate should be based, at least in part, upon the average cost in terms of overhead to the attorney. The Board then submits a budget to the legislature based on past experience, estimates of the future needs for appointed counsel, and on the hourly allowance applicable in the budget year. The trial courts review counsel's vouchers, or requests for payment, and pass upon the number of hours reasonably spent in the individual representation. The statutes of Kansas do not provide for the amount of the fee to be entirely in the hands of the trial courts, as do those of New Hampshire; the matter is left to be fixed by cooperation between the three branches of government. We do not find that the statutory scheme violates the separation of powers doctrine.

VIII. THE EQUAL PROTECTION ISSUE.

Respondents contend that the present system violates the equal protection clause in three respects: (1) it treats attorneys differently from other professionals by requiring them to subsidize indigent criminal defense; (2) it treats attorneys differently depending upon their geographic location; and (3) the quality of defense available to indigents depends on geographic location.

The traditional yardstick for measuring equal protection arguments is the "reasonable basis" test. Under this test, the constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. *Ernest v. Faler*, 237 Kan. 125, 129, 697 P.2d 870 (1985).

The respondents claim that the system impermissibly imposes the financial burden of representing indigent defendants on a select group of citizens—attorneys. If requiring attorneys to provide representation for the statutory rate of compensation violates the Fifth Amendment, then the legislation affects a fundamental right. As attorneys are not a suspect class, the appropriate test is whether the classification bears a rational relationship to a legitimate governmental purpose. The governmental purpose is to provide counsel to indigent criminal defendants as required by the Sixth Amendment. Assisting the indigent is a legitimate public goal, but cannot be accomplished at the expense of a particular group of people. *Cunningham v.*

*Superior Court,* 177 Cal. App. 3d 336, 348, 222 Cal. Rptr. 854 (1986) (citing *Norwood v. Baker,* 172 U.S. 269, 279, 43 L. Ed. 443, 19 S. Ct. 187 [1898]). There was testimony at the district court hearing that no other professional group is required to give services to the poor without adequate compensation, and some testimony that doctors and pharmacists may be requested (but not compelled) to provide services to the poor at reduced rates. Also, we note that veterinarians are statutorily entitled to *reasonable* compensation for services which those professionals provide for the benefit of the state. K.S.A. 47-610. In discussing an equal protection challenge raised by an appointed attorney, the California Court of Appeals in *Cunningham v. Superior Court,* 177 Cal. App. 3d at 348-49, said:

"An attorney who is appointed to represent an indigent without compensation is effectively forced to give away a portion of his property—his livelihood. Other professionals, merchants, artisans, and state licensees, are not similarly required to donate services and goods to the poor.

"As one commentator has noted: 'it is unfair to put on any working group the burden of providing for the needy out of its stock in trade. No one would suggest that the individual grocer or builder should take the responsibility of providing the food and shelter needed by the poor. The same conclusion applies to the lawyer. The lawyer's stock in trade is intangible—his time fortified by his intellectual and personal qualities, and burdened by his office expenses. To take his stock in trade is like stripping the shelves of the grocer or taking over a subdivision of the builder.' Cheatham, *Availability of Legal Services: The Responsibility of the Individual Lawyer and of the Organized Bar* (1965) 12 UCLA L.Rev. 438, 444; see also, *The Uncompensated Appointed Counsel System: A Constitutional and Social Transgression* (1972) 49 Ky. L.J. 710, 715."

While Kansas attorneys are not required to serve indigent defendants without compensation, the effect is similar if their overhead and out-of-pocket expenses are not covered by the compensation they receive. Cited are three other cases which do not *expressly* hold that requiring attorneys to subsidize indigent criminal defense denies the attorneys equal protection. Two of these cases held that the bar should not bear the *entire* burden of making counsel available. *State v. Rush,* 46 N.J. 399, 412-13, 217 A.2d 441 (1966); *In Interest of D.B.,* 385 So. 2d 83, 92 (Fla. 1980). The third case involved a *due process* challenge to requiring attorneys to represent indigent *civil* litigants without compensation. *Menin v. Menin,* 79 Misc. 2d 285, 359 N.Y.S.2d 721 (1974).

The State's position is that attorneys are different from other

professionals or tradespeople and, therefore, there is a rational basis for imposing this burden on them. This sentiment is echoed by the Nevada Supreme Court, which held that requiring attorneys to represent indigent defendants for the limited statutory fee allowance did not violate equal protection because of the bar's ethical obligation to provide such service. *Daines v. Markoff*, 92 Nev. 582, 587, 555 P.2d 490 (1976).

We agree fully that the bar of this state has an ethical obligation to provide legal services to the indigent accused. That ethical obligation may justify paying attorneys a reduced fee for legal services to the poor, less than the fee an attorney might charge a financially solvent client for the same service, but not less than the lawyers' average expenses statewide.

The next challenge is that the present system impacts disproportionately on members of the bar depending on their geographic location. Counsel note that three schemes exist for insuring the availability of counsel: public defender systems which serve some counties and relieve the private bar of the responsibility, systems in which participation on the panel is voluntary, and systems in which participation on the panel is mandatory. It is the attorneys in the latter system who complain of equal protection violations. They note the effect of the diverse systems is that only about 35% of the members of the bar are *required* to represent indigent criminal defendants for the rates available to appointed counsel.

The State has imposed a classification which affects two or more similarly situated groups in an unequal manner. Various Kansas attorneys in private practice are affected differently. The three systems place a different burden on attorneys depending on their geographic location. Some districts require attorneys to be on appointment panels, while participation is voluntary in the majority of counties. This is acknowledged by one member of the Board despite the Board's rule that all licensed attorneys must participate. Attorneys in public defender districts are not subject to appointment since appointments from the private bar are unnecessary except in conflict of interest situations and in some misdemeanor and juvenile cases. Participation in the appointment panel in public defender districts is voluntary. Government-employed attorneys are not subject to appointment. As a

result of these combined factors, about 65% of the attorneys in private practice are not subject to appointment. The net effect is that an attorney in private practice in a small district without a public defender bears a much greater proportion of the burden than do his or her peers in voluntary or public defender districts. The evidence discloses that of the sixteen members of the Executive Committee of the Kansas Bar Association, only three had criminal appointments in 1986. Of the eligible members of the judicial council, only one had an appointment in 1986. No members of the Board of Indigents' Defense Services take appointments despite a determination that representation would not constitute a conflict of interest. Finally, only six out of fifteen or more of the attorney members in the legislature had appointments in 1986.

It is difficult to articulate a rational basis for requiring some attorneys to donate a considerable amount of their time and money to indigent criminal defense, and other attorneys none, simply because of their geographic location. As the California court said in *Cunningham*, 177 Cal. App. 3d at 349, a paternity case:

"Requiring lawyers to devote a reasonable amount of time to represent indigent defendants in paternity cases as a condition of licensing, might not offend constitutional principles *if all lawyers were to bear the burden evenly.* But, those lawyers who specialize in the nonlitigation aspects of such diverse areas of law as tax, corporation, entertainment, real estate, and business, may never have seen the inside of a courtroom. Although there may be some exceptions, it is not likely that members of this class of attorneys, who lack training and experience in litigation, would be selected to represent indigents in paternity cases." (Emphasis supplied.)

A second equal protection problem arises from the differential treatment of assigned attorneys and public defenders. Most of the 3.8% budget cut mandated by Governor Hayden in early 1987 came out of the assigned counsel budget. This was passed on to appointed counsel by reduced fee and expense allowances. The Board did not cut public defenders' salaries or overhead. The State pays the overhead in the public defenders' offices, including rent, salaries, malpractice insurance, and the expense of some legal research materials. A 2.1% salary increase has been approved for next year.

The cumulative impact of this differential treatment on the

rural Kansas attorney is obvious. Those in mandatory districts, such as Osage, Anderson, and Coffey Counties, are required to shoulder the burden of indigent criminal defense, paying part of the expense out of their own pockets, while being paid fees that average less than their fixed office overhead. Meanwhile, most Kansas attorneys are not required to participate or contribute. We hold that the present system, as administered, violates the Equal Protection Clause of the United States Constitution.

The final equal protection argument concerns alleged differences in the quality of defense provided to indigent defendants by appointed counsel and public defenders. The public defender is required to provide "quality legal representation," and must meet certain qualifications, including "demonstrated knowledge of criminal law and effective ability to provide actual representation." K.A.R. 105-21-1. Public defender offices have been established in the third, eighth, eighteenth, and twenty-eighth judicial districts and may serve other counties by mutual agreement with the administrative judge for that county and the Board. K.A.R. 105-10-1 (1986 Supp.).

The only qualifications of appointed counsel specified in the regulations are that they be licensed and engaged in private practice. K.A.R. 105-2-1 (1986 Supp.); 105-3-2. There has been no showing, however, that any defendants have been *denied* effective assistance of counsel. There has been no showing of deficient performance or that deficient performance adversely affected the outcome of any trial. The Sixth Amendment guarantees only effective assistance of counsel; it does not guarantee the best counsel available. Therefore, even if the public defenders *are* better able to provide a defense (which is not definitely established), equal protection is not denied if the appointed attorneys provide *effective* assistance of counsel. We recongnize no "specialists" in criminal law, and we do not require any special qualifications to practice criminal law *in general*. Special qualifications are not *necessary* to provide effective assistance of counsel in criminal cases. Further, as we pointed out earlier, under our discussion of THE OBLIGATION TO FURNISH COUNSEL, judges should not appoint incompent counsel, and we are confident that they do not knowingly do so. We take judicial knowledge that Mr. Orville Cole, ap-

pointed counsel whose motions for discharge were mentioned at the commencement of this opinion, is an able, effective, and experienced trial attorney. The evidence now before us does not demonstrate that indigent criminal defendants are being denied effective assistance of counsel.

IX. THE THIRTEENTH AMENDMENT ISSUE.

Section 1 of the Thirteenth Amendment to the United States Constitution provides:

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."

It is argued that the present system of appointing counsel for indigent defendants amounts to involuntary servitude. Shapiro characterized this argument as "one that has generally, though not universally, been rejected by the courts." *The Enigma of the Lawyer's Duty to Serve*, 55 N.Y.U. L. Rev. 735, 768 (1980), and see authorities cited therein. The State responds only that this argument has been rejected by one United States Circuit Court of Appeals. See *Williamson v. Vardeman*, 674 F.2d 1211, 1214 (8th Cir. 1982).

Shapiro provides an interesting analysis of this argument. He says:

"In what is perhaps the best judicial analysis of the scope of the thirteenth amendment and related statutes, the Second Circuit has concluded that a condition of servitude is within the amendment's proscription only when the individual is subjected to physical restraint or threat of legal confinement as an alternative to service. Thus, the amendment does not apply if the individual may choose freedom, even though the consequences of that choice are (or are believed to be) as grievous as deportation or heavy financial loss. For this reason, no substantial thirteenth amendment question was presented by professional baseball's famed reserve clause: a player's violation of the clause could lead to a complete loss of earning power, but not to confinement.

"In the case of the lawyer, then, the imposition of professional discipline, even to the point of disbarment, for refusal to accept an assignment appears to pass muster under the thirteenth amendment. But those who have reached this point with me may share my doubts about imprisonment for contempt for such a refusal. That issue, though, relates only to the question of sanction, not to the power to impose the obligation and to make it stick." 55 N.Y.U. L. Rev. at 770.

We know of no Kansas attorney who has been imprisoned for failure to accept an appointment under the Act. Without further discussion, we hold that the system does not offend the Thirteenth Amendment.

## X. DOES THE PRESENT SYSTEM VIOLATE ARTICLE 2, § 17 OF THE KANSAS CONSTITUTION?

It is argued that the Indigent Defense Services Act and its accompanying regulations violate Article 2, § 17 of the Kansas Constitution. This section provides:

"All laws of a general nature shall have a uniform operation throughout the state: *Provided,* The legislature may designate areas in counties that have become urban in character as 'urban areas' and enact special laws giving to any one or more of such counties or urban areas such powers of local government and consolidation of local government as the legislature may deem proper."

Johnson County is designated as an "urban area." K.S.A. 19-3524. Anderson, Coffey, and Osage Counties have not been so designated, and the proviso is of no importance to our discussion on this issue.

The parties disagree regarding the proper standard of review of this issue. The KBA argues in its brief that the typical presumption of validity and the court's duty to uphold the statute if at all possible do not apply to this section. In support of this contention, it cites *Boyer v. Ferguson,* 192 Kan. 607, 389 P.2d 775 (1964). The court in *Boyer* stated:

"Where an Act is attacked as being violative of Article 2, Section 17 of the Kansas Constitution, the rules of statutory construction with the accompanying presumptions of validity have no application." 192 Kan. at 614.

Immediately following the quoted portion, the opinion continues: "The third clause of Article 2, Section 17 provides: '. . . and whether or not a law enacted is repugnant to this provision of the constitution shall be construed and determined by the courts of the state.' " 192 Kan. at 614. As the State points out, the third clause of section 17 was removed in 1974.

The language of the third clause had been interpreted to impose a duty on the courts to determine a statute's validity without regard to anything the legislature had declared. 192 Kan. at 614 (quoting *Water District No. 1 v. Robb,* 182 Kan. 2, 318 P.2d 387 [1957]; and *State, ex rel., v. Hodgson,* 183 Kan. 272, 326 P.2d 752 [1958]). Thus, the presumption of validity did not apply.

Since the third clause was removed in 1974, this court has returned to the presumption of validity analysis applicable to

most constitutional challenges of legislative acts. See, *e.g., Board of Riley County Comm'rs v. City of Junction City,* 233 Kan. 947, 959, 667 P.2d 868 (1983), involving an Article 2, § 17 challenge. Thus, the traditional test of a statute's constitutionality applies to statutes challenged under Article 2, § 17: The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the Constitution. *Sheppard v. Sheppard,* 230 Kan. 146, 148, 630 P.2d 1121 (1981), *cert. denied* 445 U.S. 919 (1982).

The scope of the present version of Article 2, § 17 has been interpreted by this court as follows:

"[T]he only prohibition contained in Article 2, Section 17, relates to laws of a general nature which affect the people of the state generally. Such laws must apply uniformly throughout the state and thus be *geographically* uniform." *Stephens v. Snyder Clinic Ass'n,* 230 Kan. 115, 127, 631 P.2d 222 (1981).

The first question, then, is whether the Indigent Defense Services Act is a "law of a general nature." The State argues that it is not because it affects only a small class—indigent criminal defendants. On the other hand, as a criminal procedure statute, it is of universal interest to the people of the state. This position seems most plausible in light of this court's decision in *Rambo v. Larrabee,* 67 Kan. 634, 73 Pac. 915 (1903). The statute challenged in *Rambo* provided that any person convicted of murder or manslaughter in any county containing more than 65,000 inhabitants, who filed an affidavit setting forth just cause for appeal and inability to pay for a transcript and record, and who satisfies the judge that he is unable to pay, shall be entitled to have the record prepared at the expense of the county. 67 Kan. at 635. The court held the act was a law of a general nature:

"As will be seen, it is an act relating to criminal procedure and practice. It interests every person in a designated class, no matter where he may reside. . . . The nature of this act is as general as is any step in the criminal procedure, or as is any law defining crime itself. Being so, the requirement is that its operation be uniform throughout the state." 67 Kan. at 644.

Although it applies only to indigent criminal defendants (and to the lawyers in private practice throughout the state), the Indigent Defense Services Act is a law of a general nature under the reasoning in *Rambo.* It is followed, and is of consequence, in all

counties of the state. It is subject to the requirements of Article 2, § 17.

It is claimed that the law violates this section because it affects lawyers (and, arguably, criminal defendants) differently depending upon their geographic location. As such, its operation is not geographically uniform. This court has interpreted Article 2, § 17 to permit some classification, however, provided the classification is not arbitrary. This notion was announced in *Rambo*. After holding the law at issue was "of a general nature" and subject to the constitutional requirements, the court continued:

"We do not conceive this phrase to mean that an act, in order to have uniform operation throughout the state, must affect every community or individual alike. It is entirely competent for the legislature to adapt its laws general in their nature to general classifications, either of individuals, surroundings, or conditions, but such classification must always be a natural one, not an arbitrary or fictitious one. If the nature of the law is general, that is, generic, its operation must be as general throughout the state as are the genera." 67 Kan. at 644.

The court concluded that the legislation involved applied to a given class, but only in one county, and that there was no rational basis for such a classification based solely upon population. The court added, however:

"We do not mean to hold that a classification for any purpose based upon population would be invalid. For a great many purposes, such a classification would be most reasonable and natural, but for the classification here attempted it is not. Indeed, it is very apparent that the classification attempted was only for the purpose of avoiding the constitutional inhibition." 67 Kan. at 647.

A rational justification for treating different localities differently has continued to preserve the constitutionality of several statutes in spite of an Article 2, § 17 challenge. See *Board of Riley County Comm'rs,* 233 Kan. at 958-59, and authorities cited therein.

Arguably, there is a rational basis for the differential treatment of counties and judicial districts by the Indigent Defense Services Act. The installation of public defender offices in only four judicial districts may be justified by the more dense populations and the greater number of criminal cases in those districts. Similarly, a higher number of attorneys may justify the "voluntary" panels permitted in some districts. Requiring mandatory participation on indigent defense panels is the method utilized

to guarantee the right to counsel in counties or districts with smaller attorney populations.

The basis of the differential treatment observed in the operation of the Act cannot lawfully rest entirely upon financial or economic considerations. Financial or economic reasons alone cannot provide a rational basis for an otherwise unconstitutional disparate treatment. As the United States Supreme Court stated in *Watson v. Memphis,* 373 U.S. 526, 537, 10 L. Ed. 2d 529, 83 S. Ct. 1314 (1963):

"[V]indication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them."

There was no evidence and no testimony before the trial court regarding this issue. We take judicial notice, however, of the great disparity in the number of criminal cases between various counties and the judicial districts of this state, and of the distances involved in some of our larger judicial districts. The problem is how to provide competent counsel within a short time to indigent defendants throughout the state. Counsel must frequently be provided promptly to the accused after arrest. The problem is geographic as well as economic. Using the private bar in the less populous counties would not only be more economical, but would provide prompter representation of indigents charged there.

That does not, however, resolve the problem. As a practical matter, the majority of attorneys in private practice in the larger counties are rarely, if ever, appointed to represent indigent defendants. All attorneys in private practice in the counties here involved, however, are required to serve regardless of their desire to serve, regardless of the time they may have spent doing pro bono work for the poor or for community organizations, regardless of the demands of their respective practices, and regardless of their competence in the criminal law. In counties which have the public defender system, most indigent defendants are represented by counsel who must have "demonstrated knowledge of criminal law and effective ability to provide actual representation." K.A.R. 105-21-1. There is no such requirement of attorneys appointed from the private bar.

The present system quite obviously does not operate uni-

formly throughout the state. How it works depends upon where an indigent is charged with crime, or where an attorney maintains his or her practice of law. The system, as now operated, violates Article 2, § 17 of the Kansas Constitution, as contended by Judges Smith and Fromme.

XI. CONCLUSION.

The State of Kansas has the obligation to furnish counsel for indigents charged with felonies, for indigents charged with misdemeanors when imprisonment upon conviction is a real possibility, and for other persons upon certain circumstances. The State also has an obligation to pay appointed counsel such sums as will fairly compensate the attorney, not at the top rate an attorney might charge, but at a rate which is not confiscatory, considering overhead and expenses. The basis of the amount to be paid for services must not vary with each judge, but there must be a statewide basis or scale. No one attorney must be saddled with appointments which unreasonably interfere with the attorney's right to make a living. Out-of-pocket expenses must be fully reimbursed.

Kansas attorneys have an ethical obligation to provide pro bono services for indigents, but the legal obligation rests on the state, not upon the bar as a whole or upon a select few members of the profession.

The present system as now operated, we have held, violates certain provisions of the United States and the Kansas Constitutions. Changes are required. These may come about by both legislative and administrative action. The adoption of different bases for computing appointed counsel's compensation, the budgeting and funding of the same, and the possible extension of public defender systems or the adoption of contracts to provide counsel for indigents in some areas, or an intermixture of those and possibly other solutions, takes time. Meanwhile, the indigent criminal defendants must have counsel, and that is a burden which the bar must continue to shoulder, at least temporarily, under the present system.

The general orders of Judges Smith and Fromme are set aside insofar as they define "reasonable compensation," provide that attorneys cannot be required to serve unless that level of compensation is forthcoming, and provide for the dismissal of

charges unless such hourly compensation is provided. Respondents are directed to comply with the present statutes and regulations until July 1, 1988, and to appoint counsel under the present system until that date, taking care to see that competent counsel are appointed and no unreasonable burden or hardship is placed upon any attorney or attorneys. As we indicated in our temporary order, entered on July 17, 1987, it is the time necessarily spent by an attorney on indigent appointments, and not the number of appointments, which is the important factor in determining reasonableness or unreasonableness, fairness or hardship.

The requested order of mandamus is denied.